Next case is AIA Engineering and Viga Industries versus Megato International, 2013-10-35. And we'll be ready with you, Mr. May. Good morning, Your Honors. I'm Paul Nye with my colleague, Matthew Cox, who represents the appellants. I'd like to reserve four minutes for our rebuttal. AIA seeks today three principal types of relief in this appeal. We're asking the court, most importantly, to reverse the district court's finding of willful infringement in which it denied our motion for judgment as a matter of law on the question of willful infringement and to vacate the attendant's enhanced damages because Megato failed to prove by clear and convincing evidence that AIA acted despite an objectively high likelihood that its conduct infringed a valid patent. We're also asking the court to vacate the exceptional case determination in the attendant award of attorney's fees and taxable costs. The district court made it clear that the exceptional case determination was based solely on the finding of willful infringement. And third, we're asking the court to remand two of our defenses for a new trial because of the court's errors both in the jury instructions and the exclusion of evidence, and in addition because we believe that the jury's verdict was against the great weight of the evidence. Can I just add, John? Suppose we were to agree with the point you mentioned last, that the jury instructions on public use and its related experimental use component or corollary was what was wrong and required a new trial. Should we postpone any decision on the question of willfulness until there's a retrial? Because if there's no ultimate judgment at that current point requiring a new trial, there's nothing to evaluate on willfulness? No, Your Honor. We don't believe so. We believe that if this court determines that there should be a new trial on either of those two issues for which we're requesting one, that conclusively proves that there were reasonable because the objective willfulness, recklessness problem, could not be met. This court in the unilogue said that when there is a reasonable construction that can be given to a defense, that there is no infringement. The first problem of Seagate cannot be met. So we believe that if this court finds for us on any of those two issues... Is that really the case? I have the same sort of query that Judge Toronto has. Let's assume there's a jury instruction that's indisputably incorrect and you lose. But why does that... I mean, if we find that there's willful conduct, if we can uphold the finding of willfulness, in other words, that your defense was objectively unreasonable, then what course do we have? Do we then... If we conclude that, then we can say we don't care, that we don't have to have a new trial on that issue because we think the defense was objectively unreasonable. In this circumstance, Your Honor, we're dealing with four objectively reasonable defenses or claims asserted by Magato. So, although the question was directed to a new trial with respect to only one of those, we contend that whether a new trial was granted on any of those two, we still had four objectively reasonable defenses which foreclosed the finding of willful infringement. And that would be our non-infringement claims. That would also include our obviousness... I know that, but can we stick to my... Let's assume we're just on public use and let's assume we were all hypothetically in agreement that the jury instruction was blatantly wrong. But are we still not free to evaluate the evidence and the judge's conclusions with respect to objective reasonableness and affirm notwithstanding those erroneous jury instructions? I think this court could do that. I believe, however, the court further looks at the full scope of the legitimate public use defense that was asserted by Magato at trial and throughout the course of these proceedings that the court make a determination that that defense was objectively willful. Let me ask you about that. Let's get into it. Because it seems to me there's a... The other side is effectively arguing more on the experimental use than it is necessarily on the public use. And that just seeing this stuff, it doesn't matter if it were open to the public and 4,000 spectators came and saw this going on. Nobody has any clue what it is about and necessarily what composition was involved in any of the stuff that was being tested or used. Am I correct about that? I think that's a fair characterization of the position that's been taken. Well, what's your answer then? Our answer to that is the Supreme Court in Electric Disorder of Battery Storage v. Shimatsu said that there is public use when a machine is used in the ordinary course of manufacture in a factory. That's what we had here. So the public use is undeniable. Let's go to the question regarding experimental use. The biggest problem we had with the experimental use was the wholesale failure of Magato to demonstrate that this was in any way an experiment or a trial that was designed for the purpose of filing for a patent. And in Clockmaster, the standard that this court articulated was the purpose of the testing  and that wasn't the case. Dr. Francois, who was the inventor, never said anything about how these Empire trials played into the patent application or the invention itself. There were no logs, no records, none of the indicia of experimentation was provided after we made the Bromfacia case for the showing that this was a public use. So we think that there was very little evidence, or actually no evidence, that this was experimental. Moreover, two of the pieces of evidence that were excluded, we think erroneously, by the district court were the Magato newsletters that alluded to this invention having been perfected before its use at Empire, before the critical date. And we believe that ultimately the court denied or excluded that evidence on the grounds that he was afraid it would confuse the jury despite trial counsel's vigorous attempt to explain to the court that it went to two issues, willfulness on the subjective prong insofar as the jury was going to see that, and also the question of experimental use or prior public use. We believe that had the jury seen those two pieces of evidence, they would have concluded that there could be no experimental use because the invention had been reduced to practice. Those were admitted, but those were excluded. What was admitted, however, was the procedure for producing this composite pad. That, Magato's own people testified, was the recipe for excellence. Can I ask you about back to the jury instruction? The other side says, I think, that in order to prevail on certain jury instructions, the standard is that you have to come up with some jury instructions that are acceptable and correct. And I think if I understand the argument correctly, you did not because there is that weird phrase in the stuff about the invention. What's your response to that? In the original proposed jury instructions, which were submitted I think about two weeks before the trial, there was a typographical error. It misstated the law. However, the colloquy between trial counsel and the court during the course of the jury charge makes it very clear that Mr. Lieberworth, AIA's counsel, was explaining... Do you want to give me a paperclip on that? Because I remember you did cite various... Yes, Your Honor. Cites to the record, some of which didn't quite do it for me. You can come back with it on the bottom. Yes, Your Honor, I will. Can I just ask you one question about that? And maybe this is more a question for the other side. But it did seem to me, and I think you're not disputing, that in the proposed written instruction there was a phrase about the inventor that was really overbroad. As I understand what the actual dispute was at trial, that phrase was not actually an issue. That there was no real issue that the inventor was the one engaging in this use. This was all a question about whether someone else was and was under sufficient control and obligation and the experimental use. So even if that had been an erroneous piece of the proposed instruction, it wouldn't have actually had any bearing on the dispute over this matter in the case. That's correct, Your Honor. That typographical error went to the phrase that we felt the court needed to provide the jury so they clearly understood what public meant in terms of public use. That it didn't mean necessarily that somebody had to parade around in a public square, but that a factory, such as the Empire Factory, could be the public if the invention was being used by persons other than the inventor, not subject to the restrictions imposed by the inventor. There's another piece of public use law, and I guess I want confirmation that that other piece was not at issue here, namely the piece that says the inventor is making a profitable commercialization through the use. That is not our contention, Your Honor. There was a commercial component to what was going on at Empire, because Empire was using the invention for the purpose of its own day-to-day business. However, we have not contended that this was a commercial exploitation situation under the public use analysis. One of the important things we think that has to be taken into consideration in this case, in which the district court misstated in its memorandum in support of its motion denying our motion for judgment as a matter of law and willfulness, is that at no time did AIA violate the ITC's exclusion order or cease and desist order. And the court says that in explaining why it found certain elements of certain defenses unreasonable. Because you defaulted on the ITC, correct? Yes, Your Honor. We defaulted on the ITC. AIA made a decision that it would proceed to the federal court. And it did not run away from this issue. It left the ITC and brought this action in the federal court, asking the court to declare the patent invalid, declare that it had not infringed the patent. So it took the fight to this court. It did not run away from the issue. And at no time is there any evidence that it defied the standing order. At the outset, from 2002 to 2008, which is the period of time between the issuance of the 998 patent, during that period of time, Claim 1 had the language, and only had the language, that the porous ceramic composite consisted of two elements, alumina and zirconia. Early during that period of time, AIA advised MAGITO that the presence of the titania in Sinterkast grains, which it was using to make the Sinterkast, put Sinterkast outside the scope of their patented invention. The testimony is very clear that there was at least 2.5% by weight titania in those grains that were used in AIA's product. Dr. Faber herself, when she analyzed Sinterkast, found 3% by weight. That is not an impurity. Dr. Faber and Dr. Bide for AIA testified that the presence of the titania had functionality both in the formation and in the composition of this ceramic composite. That is not an impurity. That is an actual component that meant that Sinterkast, having this titania by weight, was outside the 176 Claim 1 language. As a consequence, during that entire period of time, when four of the alleged wrongful sales and the 271 sale occurred, it cannot be said that AIA did not have an objectively reasonable belief that it was not infringing the product. Indeed, we believe that Magatow was well aware of this, which is what led to their application for reissuance. In the application for reissuance, Magatow stated, as it had to, that there were flaws and it failed to take full advantage of the benefit of its specification. The specification provided that the composite could include up to 3% to 4% of another oxide. Mr. Nye, you're well into your rebuttal time. I'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Bollinger.  Good morning, Your Honors. James Bollinger for Magatow, with me are my colleagues Tim Heaton and John Gressen, if it pleases the Court. After careful review, Judge Haynes properly found objective willfulness by AIA. Well, actually, I've got some questions about that. I suspect so. Yeah. The jury had a verdict, which I guess was advisory, and presumably after hard, at least we all understand that there's a legal component to this. And as I read the record, the judge just says, okay, well, I mean, in terms of doing the judgment, he didn't give any independent analysis or analysis whatsoever with regard to willfulness, including with regard to whether or not there was objective reasonableness. Am I right about that? As far as the judgment itself at the end of trial, he did not. However, that issue of willfulness was extensively briefed before trial. There was an in eliminating motion detailing precisely the issues and the parties' relative positions on willfulness, why it should go to the jury, how the judge would reach that conclusion. There was a lot of debate within the context of the jury instructions of what the jury should be instructed on willfulness, and the Court ultimately dealt with the judgment as a matter of law to be reserved on and then ultimately denied it with a very detailed explanation of why willfulness is found in this case. Would you tell us that Jay Maul? Yes. Okay, but I'm just still at the verdict. When he imposed the judgment, notwithstanding your long list about all the stuff that went on, the answer is that the district court gave no analysis or basis for his conclusion with respect to objectively reasonable. I think that's correct. Okay, so then that brings us to Jay Maul. Right. And I understand that he's got some analysis with regard to the infringement conclusions, but I'm a little troubled, so maybe you can tell me if there's more. I'm looking at 813, which is the only portion of his Jay Maul opinion that I can find with regard to the public use, and it seems to me that what he says is that after review of the record, AIA failed to present sufficient evidence of public use. There is sufficient evidence, blah, blah, blah. Therefore, this is his conclusion with respect to objectively reasonable. Am I missing something in the record here, or did he have any more with regard to analyzing the public use issue and the objectively reasonable? I think there was a discussion where he recast the various positions of the parties above that where he actually outlines what Magatow had presented as the basis for the objective willfulness and the objective recklessness conduct. I'm not so sure. I'll have to look at it to see if he actually dealt with the arch contentious. We did extensively brief public use to him on this particular issue, but as to public use as a basis for avoiding willfulness here, they didn't challenge. They only challenged two out of the eight claims. So even if they prevailed on the two claims that they had asserted against on public use, they lose on liability. So no reasonable litigant would have pursued and said I'm likely to prevail on public use recognizing that they only were attacking two out of the eight claims. What do you mean by they were only attacking two of the eight claims? They asked for a – assume for a second that the jury instruction on public use given was incorrect. Is there something in the instruction or the statement of the contention? I'm still at the jury stage. I'm not a JMO. No, no. I was going to direct your attention to the verdict form, which specifically outlined what was presented to the jury to decide what the issues were at that case. Where is the verdict form? It's at – I think I have it. 5190, is that right? 5190, yes. Yeah. That was one of the things I was going to present and I'm going to – I mean it says in validity defense, it says AIA Vega established by clear and consistent evidence that any of the following claims in ballot is obvious and then prior public use 1 and 12. Is that – That's the verdict form. The only issues presented at trial to challenge the public use of the two independent claims. And on obviousness, the same basis. They went into court with only non-infringement arguments as to the dependent claims. And so no reasonable litigant would expect to succeed under that scenario that they went in and tried this case. In view of that, I also say that even on claims 1 and 12, their proofs on public use were woefully inadequate. They were so weak that normally a litigant would challenge at the closing of their case. I'm sure you were listening. We got into a discussion about experimental use, which seemed to me to be more of what you were arguing here. And what they said, as I recall, is that there was no demonstration that the purpose of testing was connected to the purpose of filing the patent application. So you can answer that however you want, but do you want to agree with that statement as a legal statement? I don't. There is language in the Cox-Springs case that talks about the necessity of using or tying the experimental use, the experimentation by the inventor to the specific filing of the patent application. They had the burden of proof on this no matter what. It's clear and convincing. And the fact is the burden never shifts. Their papers lay out this almost prima facie obviousness type analysis where they believe that the burden is once a particular demonstration that we have to now come forward. There's some burden on us on experimental use. I think the cases that I've seen on this by this court have presented the public use challenge to the validity of a patent as more of an assessment of was it public and or was it experimental, where if it's experimental, it's not public. And so you'll look at Cox-Springs. But the question is how you establish whether or not it's sufficient. Whatever it was, was experimental under what we consider experimental under the law. So what is your view? In this case, I think the evidence, there's no dispute this was an experiment. They're trying to characterize it. Aren't they correct that it has to be tied in some way, shape or form to experiment for purposes of deriving a patent application, patentable application? Well, it goes both ways. They have to demonstrate that the experimentation, the public use was including and testing or it was using the claimed invention as limitation by limitation evidence on that. At the same time, they have to demonstrate that the experimental use was not testing for the purposes of enabling the invention, for practicing the invention. And here it was clear, and this court has ruled a number of times, the Manville case, where durability, even if not claimed, is an intrinsic property that can be experimentation. We're not talking about shifting complete burdens here. But in terms of who has to kind of come up with what evidence, if they've established that there's a public use, so let's get there. You're the ones that have to show that there's some experimentation here that's related to the patent. That can't be their burden of production in the way we go through this. I think that the burden never shifts. Well, the ultimate burden never shifts. I think there's probably no dispute about that. But you don't think that once you've established public use, if you're going to claim it was experimental use, you have to come forward with something? They were invited to present evidence on experimentation, and we did. There's no formal requirement. It's your view that the experiment must relate to the invention, and of course the patent must cover the invention, rather than the experiment must relate to the filing of the patent. That's my position. I believe that under the better view of a lot of these decisions, and those two things aren't normally different, and it wasn't really an element of proof in this case. One way or the other, there was no real debate that this was experimentation on the patented invention in the sense that there were color-coded bars that were presented and utilized in a private customer plant, and a plant that was not open to the public. And so when we presented that this was not a public use as a threshold matter, it was our position that there was an implied relationship with this customer, that they were allowed to test our material. We kept title to this. Was there a confidentiality relationship? There was an implied confidentiality relationship for these types of discussions with all of our customers whenever we did experimentation. The record reflects that. It's unrebutted. They could have deposed the Empire Mining and Staff. They chose not to. Well, I'm not sure you quite made this argument in your brief, but am I correct or wrong? Let's assume that we have some concerns about the jury instruction and what they're asking for with regard to public use and what was absent of that. Is it your view that none of that has any relationship to anything? Because we were really talking about – what you were really talking about was the piece of this that deals with experimental use. So even conceding public use wouldn't make any difference in terms of the result? The easy answer is yes, but I think the more accurate answer is that our primary argument that this was not in the public – remember, the policy considerations underlying public use deal with the notion that we're pulling something that the public has now learned to accept as being in the public domain. Our thought was this was almost like – they were trying to argue this as a penalty associated like the Eckbert v. Lippmann decision by the Supreme Court where it was a secret use, but it was a free, unabashed handing over, giving, have this invention, enjoy it, do whatever you want, the hidden corset support. And here, this wasn't that at all. We never gave up title to this. We never turned it over. We never gave it to Empire. We had arranged, dictated an experimental procedure to them. They said, fine, let's try it. We put it in place. There were color coded. We never revealed anything about the details of the ceramics that were used inside. The invention, this is what we said at the close of the case also, it was confidential to MAGITO. They never shared any of the magic that we were doing to the Empire people, so there was no public use of the invention in that context. Did the experiment succeed or fail? They failed. The fact is that these bars did not survive the environment. It was, they were testing three different types of ceramics, and they're in the documentation, and the control, and the three different types of ceramics that were in that mill, they broke. And they were retrieved by MAGITO and sent back to MAGITO's plant in Glasgow. But your main argument on public use is that even if there were 4,000 spectators that saw it, there was nothing for them to see because the inventive aspects of whatever we're talking about were not determined. Well, under FAP, I'm not supposed to say totality of the circumstances, but I think that in the public use prong, accessible to the public, I think you should be looking at a myriad of different evidentiary support to determine whether something was accessible to the public. And there's a continuum. And on this particular case, I mean, we've seen there's about 15 decisions by this court in this area. This, we're on the private use, secret use end of this, almost like gore, or some of the other decisions that involve plants that just are not accessible. Had this been a situation where the bars had been mistakenly shipped to Empire and just put into use, there'd be no question it wasn't a public use. The only way that it even becomes an argument is if, and this is what the debate was in the jury instruction, whether MAGITO gave Empire the bars for free use, to use freely any way they want, just gave it to them or sold it to them. That's what Egbert B. Lippmann says. In that circumstance, the possibility of a public use becomes much more pronounced. The concern about taking advantage of the delay in filing for a patent. But that wasn't the circumstance here. We're much more in the class of cases like allied colloid where there was experimentation in a plant that was not found to be a public use. Much more like TP laboratories where brackets were put on teeth by a doctor. Was not disclosed to the patients what was actually being tested. Really was no revealing in the public. And those are the circumstances where this court has concluded that it wasn't a public use. Can I ask you before your time runs out? Sure. Given the non-appeal as to claims 13 through 21, and I guess I want you to tell me straight up if I shouldn't do this. Why does anything here as to claim 1 and 12 matter? They don't. Is there anything about damages that might differ? I realize the verdict form says find any infringement, decide the damages. Was the damages testimony at all? Did it differentiate one claim from another? No. It was all presented. There was no arguments on either side about which claims should be considered for damages as opposed to not. I think I may ask that question in 15 seconds again. Sure. Can I just add one final point before I sit down? One final point. And it really goes to this court's prior decision in this case. We believe that the district court considered that, the jury considered that decision, considered the district court's earlier granting of the motion on improper recapture, and found that it did not provide a reasonable basis for a litigant to expect success even before those decisions. It's a retrospective view. I think that's the proper outcome here, too. Thank you, Your Honor. Thank you, Mr. Boehlinger. Ms. Deneye has a couple of minutes. Thank you, Your Honor. In response to the reference, the question concerning where in the record we have the colloquy concerning experimental use, appendix 7708 to 7751, 7686, 7689, and 7714. Outside the appendix in the docket entries, and these are some of the transcripts from the days of the trial, docket entry 442, pages 115 to 116, and docket entry 428, pages 85 to 86, is pretty informative colloquy concerning experimental use and public use between all counsel in the court. Let me just ask you the same question. Why do we have anything whatsoever to decide here? Because the objective willfulness is a determination made based on the entire record of these proceedings, not solely on the decision that was made as to what was most appropriately appealed. There could have been appeals on many other issues. We had to focus. The most egregious harm caused by the errors of the trial court was approximately $5 million in enhanced and damages and attorney's fees. That clearly was the wise course for us to focus on. And we think that the determination about whether there was objective recklessness or not is unrelated to the decision we made concerning what to appeal. In fact, it is evident from the pretrial order, which is docket entry number 324, which was entered on June 5th, approximately two weeks before the trial began, that in issue were all of the claims of the asserted patents. And the language on page 5 of that pretrial order says, The issues for the jury to decide are whether AIA has established by clear and convincing evidence that the claims of the patents in suit asserted by Magato are invalid as obvious. Right, but you didn't – I guess I take it from this jury verdict form. You did not in fact pursue six of the claims or seven of the claims or something to a jury verdict, the invalidity defense. Have we ever had a case in which we said it was objectively reasonable, that a defense that you did not even take to the jury was objectively reasonable? I'm unaware of any, Your Honor, but we did seek to take those claims to the jury. You didn't seek it long enough. We sought it during the jury charge, and we tried to point out that the jury verdict – We did present an invalidity defense. We presented an invalidity defense on all claims. So how did the verdict form come to be limited to 1 and 12? In advertence and over our objection, Your Honor. We asked that the court correct the jury verdict form on the invalidity claims based upon what was agreed to and what was presented in this pretrial order. The court denied that request. I'm sorry to pursue this, but this seems to matter a lot to me right now. Why did the judge not allow the jury to consider invalidity of 13 to 21? What did the judge say? The judge agreed that based on the proposed jury verdict form that had been presented about two weeks earlier. That you had waived it? That we had waived it despite the fact that our language in the pretrial order said that we were contesting the validity of the claims of the patent in suit, the certified magazine, which would include all of the claims. Thank you, Your Honor. Thank you, Mr. Nye. We'll take the case on revised material.